**MATCOVICH v. ANGLIM, Collector of Internal Revenue.**

No. 10306.

Circuit Court of Appeals, Ninth Circuit.

March 30, 1943.

Rehearing Denied May 22, 1943.

R. H. Schwab, of Sacramento, Cal., for appellant.

Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, Muriel Paul and Maryhelen Wigle, Sp. Assts., Frank J. Hennessy, U. S. Atty., of San Francisco, Cal., and Emmet J. Seawell, Asst. U. S. Atty., of Sacramento, Cal., for appellee.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HANEY, Circuit Judge.

The sole question involved in this appeal is: was appellant the employer of the girl dancers described herein so as to be liable for taxes levied by the Social Security Act, 42 U.S.C.A. § 1101 et seq.?

The City of Sacramento, California, has an ordinance which provides in part:

"The term 'taxi dance hall' for the purpose of this ordinance shall include any place where women dancing partners are employed directly or indirectly by the licensee * * *.

"Every taxi dance hall shall have in constant attendance at all times when open, a special peace officer who shall be approved and deputized by the Chief of Police; said officer shall be held strictly responsible for the policing of said dance hall * * *.

"It shall be unlawful for any licensee to permit any female to attend any such taxi dance hall unless she has presented a signed application to the licensee upon a form prescribed by the Chief of Police * * *."

During the period in question, appellant operated a "taxi dance hall". The procedure by which a woman obtained the right to dance in the hall was as follows: the woman sought the right from appellant and appellant then signed a card, and gave it to the woman, who presented it to the Chief of Police. The card, other than its date and signature, is as follows:

"Chief of Police:

"In compliance with Ord. 602-4th Series, desire that the Police Department furnish dance hall card of ——— who has secured permission to attend dances at the ——— Dance Hall."

After certain information was obtained by the police, a card was issued to the woman.

Upon presentation of the police card to appellant, the woman and appellant agreed in writing in part as follows:

"This is to certify that ——— is hereby granted the privilege of engaging in dancing with patrons of the undersigned at * * * in consideration of the payment to the undersigned of a portion of the money earned by her as mutually agreed upon.

"In granting this privilege, it is the intent hereof that licensee shall not become an employee of the undersigned and that she shall not become subject to the control of the undersigned.

"Licensee agrees to abide by all regulations established by the undersigned in the operation of his business."

Male patrons of the establishment purchased tickets, at a cost of ten cents each. When they danced with one of the women, they gave to her a ticket for each dance. At the conclusion of the evening, the woman presented the tickets she had collected, and received 47 cents for ten tickets. The woman was entitled to five cents for each dance except that for every ten tickets a deduction of three cents from her share was made for "free" dances. She also received a commission on refreshments purchased by the male patron.

There was a great deal of conflicting evidence on the question of control exerted over the women by appellant. Some of the findings of the court below are broader than the evidence.

There was testimony that appellant told one woman to wear evening dresses if she had them. Several women testified that appellant directed them not to wear slacks. On arrival at the hall the women registered in a book. Appellant told some of the women to dance at various times, and told

some of them to stay inside the railing except when refreshments were being purchased for them. The foregoing evidence was contradicted, but we take that most favorable to appellee, in view of the findings.

Regarding the hours of work, the police, with the consent of taxi dance hall operators, made a regulation that the women must report not later than nine o'clock p.m. and could not leave before a fixed time which ordinarily was two o'clock a.m. except on Saturdays and holidays. There was evidence, which was contradicted, that appellant told some of the women that they would have to keep these hours. There was also evidence that appellant had posted signs to the effect that for one bottle of liquid refreshment, only fifteen minutes could be spent in the beer garden.

Based on that evidence, the court below found: " * * * The hours during which the taxi dancers should be present in the dance hall, and the length of time to be consumed by them in drinking with male patrons, were prescribed by the [appellant]. The dress, deportment and behaviour of the taxi dancers were controlled and prescribed by [appellant]."

Most of these findings are true but to a very limited extent. On conflicting evidence, the court below found that appellant "reserved and, in fact, exercised the right to hire and to discharge said women dancers".

Appellant paid to appellee $2,426.25 for taxes assessed under the Social Security Act, 42 U.S.C.A. § 1101 et seq., filed a claim for refund on the ground that the taxi dancers were independent contractors, and upon denial of the claim for refund, brought this action to recover the amount paid. The court below concluded that appellant was an "employer" of the women, and denied recovery. This appeal followed.

Section 901 of the Social Security Act levies an excise tax "with respect to having individuals in his employ * * * payable by him * * * with respect to employment [as defined in section 907] * * *." Section 907 defines "employment" as "any service, of whatever nature, performed within the United States by an employee for his employer * * *."

■ We have held that the Act and the regulations promulgated thereunder mean that the question as to whether a person is an "employer" is to be determined by "the familiar principles of the common law".

Anglim v. Empire Star Mines Co., 9 Cir., 129 F.2d 914, 917.

■ Ordinarily, a taxing act "in the absence of language evidencing a different purpose, is to be interpreted so as to give a uniform application to a nation-wide scheme of taxation" and state "law may control only when the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law". Burnet v. Harmel, 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199. With respect to the act in question, a credit is allowed the employer for contributions made by him to an unemployment fund under a state law. Thus the act was designed "to operate in a dual fashion—state laws were to be integrated with the Federal Act" and it was also designed "to bring the states into the cooperative venture". Buckstaff Bath House Co. v. McKinley, 308 U.S. 358, 363, 60 S.Ct. 279, 282; 84 L. Ed. 322. " * * * it would seem to be a fair presumption that the purpose of Congress was to have the state law as closely coterminous as possible with its own". Id., 308 U.S. at page 364, 60 S.Ct. at page 282, 84 L.Ed. 322. A state court of California has held that appellant is not an "employer" within the meaning of the California Unemployment Reserves Act, Stat. of Calif., 1935, Ch. 352, p. 1226, as amended and supplemented by Stat. of Calif., 1937, Ch. 739–752, p. 2052 et seq.

■ If we should apply state law, by virtue of the state court decision, then the judgment would have to be reversed. Notwithstanding the intention that both the federal and state acts should be "closely coterminous" we think the federal act must be given a nation-wide interpretation because it operates even "though the states did not come in". Buckstaff Bath House Co. v. McKinley, supra, 308 U.S. at page 363, 60 S.Ct. at page 282, 84 L.Ed. 322.

■ Appellant contends that under the state law the license agreement was conclusive, but as stated above, state law is not controlling. Appellant further contends that the conclusion of the court below was erroneous, and argues that the agreements between him and the women definitely fixed their relationship as that of licensor and licensee, and that the other evidence regarding his "control" over the women was as consistent with a "license" as it was with an employer-employee relationship.

■ Bearing on the question is 35 Am. Jur. 445, § 3:

"While it is said that at common law there are four elements which are considered upon the question whether the relationship of master and servant exists—namely, the selection and engagement of the servant, the payment of wages, the power of dismissal, and the power of the control of the servant's conduct,—the really essential element of the relationship is the right of control—the right of one person, the master, to order and control another, the servant, in the performance of work by the latter, and the right to direct the manner in which the work shall be done * * *."

As applied here, appellant had the right to and did select the women although the consent of the police department was also required. The women received money for their work although the method of payment resembled payment on a commission basis. Appellant had the right to terminate the relationship between himself and the women. Finally, appellant could and did exercise some control over the dress and the place of work for the women, the latter being with respect to the time used in drinking refreshments, and with respect to their presence inside the railing.

Under ordinary standards an employer-employee relationship is indicated. It must be recognized, however, that all these controls could be exerted through a license arrangement. If we are to consider the license agreement between the parties as conclusive on the origin and existence of the relationship, then it is clear that the arrangement between the parties was a license. However, we think the following from Griffiths v. Commissioner, 308 U.S. 355, 358, 60 S.Ct. 277, 278, 84 L.Ed. 319, is applicable:

" * * * Legislative words are not inert, and derive vitality from the obvious purposes at which they are aimed * * *. Taxes cannot be escaped 'by anticipatory arrangements and contracts however skilfully devised * * * by which the fruits are attributed to a different tree from that on which they grew.' Lucas v. Earl, 281 U.S. 111, 115, 50 S.Ct. 241, 74 L.Ed. 731. * * *"

In view of the intention to tax when the control of one party over others was as great as is disclosed here, we think the license agreements should not be permitted to prevent the tax.

Affirmed.